Frank S. Davis v. Commissioner. Frank S. and Arline Davis v. Commissioner.
Davis v. Commissioner
Docket Nos. 53964, 53965.
United States Tax Court
T.C. Memo 1956-206; 1956 Tax Ct. Memo LEXIS 88; 15 T.C.M. (CCH) 1073; T.C.M. (RIA) 56206; September 7, 1956
*88 Net worth. - Inadequacy of petitioners' records justified use of net worth method of determining income. Income as determined by respondent modified in some respects in accordance with facts established by the evidence. Fraud: Statute of limitations. - Held, the respondent has established that some part of the deficiency for each of the years 1944, 1945, 1947 and 1950 was due to fraud with intent to evade tax, justifying imposition of 50 per cent additions to the tax under section 293(b) of the Internal Revenue Code of 1939. Held, further, that the returns for the years 1944, 1945 and 1947 were false or fraudulent with intent to evade tax and that assessment of deficiencies and additions thereto for those years is not barred by the statute of limitations, but that the return for 1946 was not shown to be false or fraudulent with intent to evade tax and assessment of tax and addition thereto is barred by the statute of limitations. James R. Murphy, Esq., and Clayton Lee Burwell, Esq., for the petitioners. George W. Calvert, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax for the years 1944 to 1950, inclusive, and additions thereto as follows: 50% Addition to
Tax (Sec. 293(b)
Year
Deficiency
IRC of 1939)
1944
$ 9,193.21
$ 4,596.60
1945
10,205.25
5,102.63
1946
1,299.89
649.95
1947
21,200.73
10,600.36
1948
283.74
141.87
1949
193.08
96.54
1950
20,066.48
10,033.24
The principal issues presented are whether the *90 respondent's use of the net worth method in computing taxable income was proper, whether any part of any deficiency was due to fraud with intent to evade tax, justifying additions to the tax, and whether assessment and collection of deficiencies and additions for the years 1944 to 1948, inclusive, are barred by the statute of limitations. Findings of Fact Some of the facts are stipulated and are found as stipulated, the stipulations being incorporated herein by this reference. Frank S. and Arline Davis were married in 1931 and from that time until 1950 they were residents of North Carolina. Since July or August 1950, they have resided at Myrtle Beach, South Carolina. They have no children. Frank S. Davis did not file Federal income tax returns for the period 1935 through 1941, but filed returns each year from 1942 to 1950, those for 1948, 1949 and 1950 being joint returns. All returns were timely filed with the collector of internal revenue for the district of North Carolina. Arline Davis had no independent source of income and appears as a petitioner herein only by reason of having filed joint returns for the years 1948, 1949 and 1950. Whenever the term "petitioner" is used *91 herein it refers to the petitioner Frank S. Davis. The petitioner was born in Lexington, North Carolina, in 1909. He has a fourth grade education and went to work when he was 14 years of age. His first work was running a knitting machine and driving a truck for a hosiery mill. He commenced operations in the illegal liquor business in 1928 and continued in that business until 1951. He operated in and around Greensboro, North Carolina, where the sale of liquor was illegal. He sold to retail bootleggers, private clubs and individuals. During the period 1929 to 1939 the petitioner was convicted four times of violation of state and Federal liquor laws and served sentences totaling about two and one-half years in penal institutions. He was also convicted of "bogus billing" of whiskey. The petitioner purchased his liquor from various liquor wholesale suppliers in Maryland and Washington, D.C., and from his brother, Ervin Davis. The liquor was purchased in truck load lots and sold in lots ranging from a case to a truckload. The liquor which the petitioner purchased was Federal tax-paid and the petitioner had a Federal liquor license. He purchased liquor under several different names. Practically *92 all the petitioner's purchases and sales were strictly by cash. On a few occasions cashiers' checks were used in purchasing. He required a minimum amount of $25,000 of cash to conduct his business. Freight charges averaged about $2 per case and storage charges ran from 25 cents per case to $100 per month, steady rent. The petitioner himself freighted some of the liquor which he purchased but others also transported liquor from the distributors to his storage places. He usually stored about 150 to 200 cases of whiskey at a time. The cost of whiskey varied according to different brands and also sold at different prices. The average mark-up per case ranged from $5 to $7. The petitioner's delivery men were not his employees. They received 50 cents to $3 per case of whiskey delivered. Deliveries were made by automobile, the delivery men using their own cars except in 1950 when they used a 1939 Cadillac belonging to the petitioner. The delivery men would collect upon the delivery of the liquor and turn over their collections to the petitioner or to his wife. Whenever any of his delivery men were picked up by the police, the petitioner paid their fines and attorney's fees. The petitioner *93 occasionally delivered liquor himself. About two-thirds of the use of his automobiles was for purposes such as delivery and collection. The petitioner kept no records prior to 1944. In 1943 he and his wife were advised that records should be kept of his business. A bookkeeper outlined a form for the petitioner's wife to use in keeping records. She has a high school education and attended business college for one year. She has been keeping the petitioner's records since 1944. Her method of keeping accounts was to make daily notations of purchases and sales on a scratch pad or tablet. When an invoice for liquor purchased was given to her, she would note it and file it. She also made notations of sales of liquor as deliveries were made and adjusted her inventory accordingly. She kept no cash account. At the end of each month she posted summaries of her notations in notebooks. Notebooks for the years 1946 to 1949, inclusive, and for the first five months of 1950 were submitted in evidence. The entries therein were brief and consisted of monthly summaries of merchandise purchased, operating expenses and total receipts. A typical page of such books is as follows: August
1949:
Aug. 2 Rent
$ 25.00
Telephone
48.93
15 Merchandise
4,626.50
Storage
75.00
20 Merchandise
1,010.00
Total Cost
$5,785.43
Total Sales Received
6,411.50
Profit
$626.07
*94 Such books show occasional losses of liquor due to confiscation, totaling about $30,000 for the period 1946 to 1950. The invoices and other records from which entries in these notebooks were made were kept until the end of 1948 at which time petitioner's wife destroyed them. The underlying records after that date were lost or destroyed about the time the State of North Carolina seized the petitioner's furniture in 1950. In the absence of underlying bills, receipts, invoices, cancelled checks, and detailed day-to-day entries, it is impossible to determine whether the monthly entries made in the notebooks are accurate. In August of 1950, the petitioner entered into a partnership with his half-brother, Arvil Newsom, to conduct a liquor business. This partnership was terminated in February 1951. The petitioner furnished all the capital for the partnership and Newsom operated the business, collected the money and kept the books. The petitioner devoted only about 10 per cent of his time to the operation of this business. The Davis-Newsom partnership return for the year ending December 31, 1950, showed a net income of $1,995.45, one-half of which was reported by the petitioner and his *95 wife in their income tax return for 1950. The petitioner and his wife went to Florida in June 1950, returning to Myrtle Beach, South Carolina, in August 1950. While in Florida the petitioner was not engaged in any business. In October 1950, the petitioner began construction of a motor court on property which he and his wife had purchased in Myrtle Beach in that year. This construction was completed about June 1, 1951. The total cost of the motor court (including land, buildings, furniture and fixtures) was $142,425.31. During this period, the petitioner devoted 90 per cent of his time to supervision of the construction of the motor court. The petitioner's wife kept the records for this business. During the year 1950, the petitioner expended $33,123.18 in construction of the motor court. The petitioner sold the motor court about September 1, 1951, for $150,000. The entire cost of the motor court was paid for by the petitioner with cash accumulated by him, except for $25,000 borrowed from his brother, Ervin Davis, and $5,570.33 paid out of proceeds from the sale. The income of the petitioner and his wife in 1951 amounted to $12,876.84 (including the profit on the sale of the motor *96 court), the greater portion of which was derived in the latter part of the year. An accounting firm prepared the income tax returns for the petitioner and his wife for the years 1944 through 1950, which were signed by the petitioner for the years 1944 to 1947, inclusive, and by him and his wife for 1948 to 1950, inclusive. This firm also prepared the Davis-Newsom partnership return for 1950 from records maintained by Arvil Newsom. The individual returns were prepared from the notebooks heretofore referred to for the years 1945 to 1950. For the year 1944, the return was prepared from a summary of sales and expenses, but whether from a notebook is undetermined. These records of the petitioner were not audited by the accounting firm and were not checked in any way for accuracy. The petitioner's returns were prepared on the cash receipts and disbursements method. The figures reported in the petitioner's returns for 1944 through 1950 were in agreement with the figures contained in such books and records as were submitted by the petitioner to the accounting firm. On October 18, 1944, the respondent began an investigation of the petitioner's income tax returns for the years 1941, 1942 *97 and 1943. The revenue agents investigating the petitioner could find no records of any kind for the years 1941 through 1943, and when the petitioner was asked for his records he produced none. During this period the petitioner did not have a safety-deposit box and he did not have accounts or deposits in any banks. As the petitioner had no records, the respondent determined his income for 1941, 1942 and 1943 by the net worth method. The agents determined from county records that the petitioner had purchased a farm on Randleman Road for $15,000 and this was corroborated by the petitioner. They also determined from retained sales slips that he had purchased machinery at a cost of $1,955.15. He told them that he had an investment in the King Cotton Garage of $1,200. They also found that he had a Ford automobile which had cost $600. They also found that he had some mules which he stated had cost him $500. These were the total assets which the agents were able to locate. The agents checked for liabilities as closely as they did for assets and found no liabilities. They asked the petitioner about liabilities and learned that he had liquidated the last of his liabilities in 1942. The petitioner *98 stated to the agents that he kept on hand only enough money to conduct his business, and that on August 4, 1944, he did not have as much as $10,000 in cash on hand, but that he may have had from $3,000 to $5,000. The net worth of the petitioner as of December 31, 1943, was determined by the respondent to have been as follows: Cash
$30,600.00
Randleman Road Farm
15,000.00
Farm machinery
1,955.15
King Cotton Garage
1,200.00
Ford automobile
1,100.00
Mules
500.00
Total
$50,355.15 Petitioner stated to the revenue agents that his net worth at December 31, 1943, was not as great as the amount determined. The above figure of $30,600 which represents cash on hand at the end of 1943 was computed by the respondent by taking into consideration the amount of cash spent during 1944 up to August 4th for real estate, $32,500, for an automobile, $2,300, for furnishings, $1,100, and the amount the petitioner stated to the agents he had spent for liquor, $3,000, adding thereto estimated living expenses for seven months, $2,100, and an amount of $5,000 representing cash which the petitioner stated he had on hand at August 4, 1944, or a total of $46,000, and deducting from *99 that total the portion thereof which was estimated to have been earned in 1944, $15,400. This estimated amount of $15,400 was based upon the assumption that since the petitioner in 1944 was still in the liquor business some of it must have been earned in 1944 and not all in the year 1943. The petitioner filed a petition with this Court (Frank S. Davis, Docket No. 7884) contesting deficiencies determined by the respondent for 1941, 1942 and 1943. In his amended petition in that case the petitioner alleged as a fact that his net worth as of December 31, 1943, was $37,025.15. The amended petition was signed by the petitioner's attorney and was verified by the petitioner. In his sworn verification the petitioner stated that he had read the petition and was familiar with the statements contained therein. That case was not tried but was settled by stipulation covering all alleged deficiencies in taxes, additions to tax and interest, this Court entering its decision in accordance with the settlement stipulation on March 5, 1947. The petitioner paid $35,000 in settlement.the settlement agreement was based upon a reduction of the cash on hand at the end of 1943 to $23,128, instead of $30,600, *100 thereby reducing net income to that extent. In 1948 a revenue agent investigated the petitioner's income tax returns for the years 1944, 1945 and 1946, spending about a day and a half examining the petitioner's reords. The agent asked for all the petitioner's records and the petitioner produced such records as he had, such as invoices, receipts, bills and cancelled checks for the years in question. The agent also examined the petitioner's cancelled checks for 1947 and 1948. The revenue agent indicated to the petitioner in answer to his query, that he found nothing wrong with the petitioner's records and only a slight adjustment was made at that time. In 1952 a revenue agent examined the petitioner's 1948 and 1949 income tax returns. The revenue agent requested the petitioner to produce all of his books, records and cancelled checks for the years in question. The only record which the petitioner produced was the notebook for 1949 containing monthly summaries of purchases, operating expenses and sales. No bills, receipts, invoices or cancelled checks were produced for either of the two years. In November 1952, a special agent also entered the case and the investigation of the petitioner's *101 income tax liability was expanded to cover the years 1944 through 1951. The petitioner was never advised officially that a re-examination or reinvestigation of the years 1944 through 1946 would be undertaken. The petitioner was again asked to produce his records for the years 1944 through 1950. The only records produced were the notebook for 1949 and certain records with respect to the construction cost and operation of the Coral Sands Motor Court for 1950 and 1951. The petitioner told the agents that he had no records for 1944 through 1946 and that he thought his records for subsequent years, except for notebooks similar to the 1949 notebook which were in the files of the accounting firm, had probably been seized by the State of North Carolina when they attached his property. The special agent went to North Carolina to see the attorney who was in charge of the seized property but none of the petitioner's records could be found. Because of the lack of records for some years and inadequacy of records for other years the respondent resorted to the net worth plus expenditures method of determining the petitioner's taxable income for the years 1944 to 1950, inclusive. No audit was made *102 of the Davis-Newsom partnership, nor was any request made for the books thereof. In the course of this investigation the petitioner told the revenue agents that when he went to Myrtle Beach in 1950 he had cash in an amount between $100,000 and $105,000. The opening net worth of the petitioner for the year 1944 was determined by the respondent on the basis of the prior investigation for the years 1941, 1942 and 1943. The revenue agents requested the petitioner to submit net worth statements but he never did submit complete statements in accordance with the forms which were furnished to him. The respondent determined that the petitioner's cash on hand as of January 1, 1944, was $23,128. This amount was the same as the figure used for cash on hand at December 31, 1943 in the settlement of the petitioner's liability for the years 1941, 1942 and 1943. At January 1, 1944, the petitioner had cash on hand in the amount of $30,600. On January 1, 1944, the petitioner owned a farm known as the Randleman Road Farm which had a cost basis of $15,000. He sold the farm for $16,500 in 1945. He paid expenses (including sales commission) in the amount of $905.20 connected with the sale. He realized *103 a long-term capital gain of $594.80 on the sale of the farm, onehalf of which, $297.40, was eliminated from taxable income for 1945 by the respondent in his determination. The petitioner also had at January 1, 1944, house furnishings which had a cost of $6,500. His house furnishings were seized by the State of North Carolina in 1950. He owned livestock at January 1, 1944, which had a cost of $925. At the end of each of the years 1944 to 1947, inclusive, he owned livestock which had a cost of $555, $400, $275, and $160, respectively. He also owned farm machinery at the end of each of the years 1943 to 1950, inclusive, which had a cost basis of $1,955.15. The petitioner had a $1,200 investment in the King Cotton Garage, Greensboro, North Carolina, at the end of each of the years 1943 to 1949, inclusive. This investment was not profitable and was abandoned in 1950. The respondent included this $1,200 item in opening and closing net worth for each of the years in question, except closing net worth for 1950. At the end of each of the years indicated, the petitioner owned automobiles as follows: Year
Automobile
Cost
Total
1943
Ford
$1,100.00
$1,100.00
1944
Ford pick-up
662.00
Cadillac
2,300.00
2,962.00
1945
Ford pick-up
662.00
662.00
1946
Ford pick-up
662.00
Ford sedan
1,257.41
1,919.41
1947
1947 Pontiac sedan
1,836.39
1,836.39
1948
Cadillac
3,449.02
1948 Pontiac sedan
2,203.30
5,652.32
1949
1949 Cadillac
4,103.87
4,103.87
1950
Oldsmobile
2,000.00
2,000.00
*104 To recapitulate, at January 1, 1944, the petitioner had cash and assets with costs as follows: Cash
$30,600.00
Randleman Farm
15,000.00
Farm machinery
1,955.15
King Cotton Garage
1,200.00
Ford automobile
1,100.00
Livestock
925.00
House furnishings
6,500.00
Total
$57,280.15 The petitioner had no liabilities at January 1, 1944. The respondent determined that the petitioner's cash on hand at December 31, 1944, was $20,000. This figure was based on the premise that the petitioner required some cash to operate his liquor business and the fact that during the early part of 1945 the petitioner paid about $20,000 in Federal income taxes, additions to the tax, and interest. At December 31, 1944 and January 1, 1945, the petitioner had cash on hand in the amount of $25,000. The respondent determined that at December 31, 1950, the petitioner had cash of $79,118.57. In so doing he took into consideration that the petitioner had stated that when he went to Myrtle Beach in August 1950, he had between $100,000 and $105,000 in cash. In arriving at the figure for cash on hand at December 31, 1950, the respondent's starting point was $142,425.31, the total cost to *105 the petitioner of the motor court which was completed about the middle of 1951. From this he subtracted the $25,000 which the petitioner had borrowed from his brother Ervin and the $5,570.33 paid by the petitioner later out of the proceeds of the sale of the motor court. The resulting figure, $111,854.98, was considered by the respondent to be the cash accumulated by the petitioner which he expended for the motor court. To this he added cash determined to have been expended for living expenses for six months in 1951 in the amount of $2,500, making a total of $114,354.98. From this he deducted the amount which he considered was expended during 1950 by the petitioner on the motor court, $35,236.41, thus arriving at the figure of $79,118.57 as representing the petitioner's cash at December 31, 1950. The respondent had determined that the petitioner had $20,000 cash on hand at December 31, 1944. The difference between that figure and the $79,118.57, namely, $59,118.57, was allocated over the intervening years in proportion to the amount of gross sales of liquor shown by the petitioner in his returns for those years. In such allocation it was considered that the petitioner had sold one-half *106 of the liquor reported as gross sales in the Davis-Newsom partnership for 1950. The respondent thus determined cash on hand at the end of the years 1945 to 1950 to have been as follows: Cash on Hand
Year
End of Year
1945
$25,277.34
1946
31,889.22
1947
45,149.28
1948
59,445.86
1949
66,068.21
1950
79,118.57
In the above computation the amount expended on the motor court in 1950 was considered to have been $35,236.41. It is stipulated, however, that the amount expended in 1950 for such purpose was $33,123.18, which would increase the cash on hand at December 31, 1950, to $81,231.80. We have found hereinabove that the petitioner had cash in the amount of $25,000 at December 31, 1944. The petitioner had cash on hand at the end of each of the years 1945 to 1950, as follows: Year
Cash
1945
$30,019.64
1946
36,308.66
1947
48,921.23
1948
62,529.21
1949
68,818.68
1950
81,231.80
In 1947 the petitioner and his wife opened a bank account in the Bank of Greensboro, Greensboro, North Carolina, which contained the following year-end balances: Year
Amount
1947
$27,185.96
1948
3,819.15
1949
4,003.05
1950
3,999.05
*107 In 1950 the petitioner opened a bank account at the Myrtle Beach Bank and Trust Company, Myrtle Beach, South Carolina, in the name of his half-brother, Arvil Newsom. This account had a balance of $3,458.07 on December 31, 1950. In August 1944, the petitioner purchased a farm at Sedgefield, North Carolina, at a cost of $32,500. He made improvements on the property costing $10,000 before the end of the year 1944. In connection with the purchase, the petitioner borrowed $15,000 from his brother, Ervin Davis, which was repaid in 1945. In 1947 the petitioner executed a deed of trust covering this property to secure the Bank of Greensboro for a loan. The property was sold by the Bank of Greensboro in 1950 under the deed of trust, for $48,000. Expenses of $2,784.06 were incurred in the sale and the petitioner derived a long-term capital gain of $2,715.94, of which one-half, or $1,357.97, was deducted by the respondent in his computation of the petitioner's taxable income for 1950. By December 13, 1950, the trustee had disbursed $41,289.90 (including $35,996.95 and $2,508.89 as principal and interest, respectively, in partial satisfaction of the petitioner's bank loan), and retained undisbursed *108 a balance of $6,710.10. Arline Davis, the petitioner's wife, purchased lots in Forestdale subdivision, Greensboro, North Carolina, in 1948 at a cost of $1,800. The petitioner and his brother, Ervin Davis, purchased a yacht in 1948 at a total cost of $17,675, each paying one-half of the cost, or $8,837.50. The petitioner paid Ervin Davis $3,000 for his one-half interest in 1949 which gave the petitioner a cost basis of $11,837.50. The petitioner expended the following amounts for maintenance and operation of the yacht: Year
Amount
1948
$4,018.60
1949
2,729.96
1950
240.38 The petitioner was reimbursed by his brother, Ervin, for one-half of the expenditures during the time that Ervin was a co-owner of the boat. On December 31, 1950, the petitioner had a net investment in the Davis-Newsom partnership in the amount of $8,179.35. On July 21, 1949, under section 519 1/2 of the North Carolina Code, the State of North Carolina assessed retail liquor taxes against Frank S. and Arline Davis for the years 1945, 1946 and 1947 amounting to $47,074.29, including penalty and interest as follows: Tax
$37,963.14
Penalty
3,796.31
Interest
5,314.84
Total
$47,074.29
*109 Such assessment was based upon 8 1/2 per cent of gross sales as reported on Frank S. Davis' state and Federal income tax returns for those years. Arline Davis brought suit in the Municipal Court of the City of High Point in 1950 contesting the assessment and collection of the above taxes against her. The suit was still pending at the end of 1950. The State of North Carolina seized the petitioner's yacht and sold it in 1950 for $8,067.43 in partial satisfaction of his tax liability. The Cadillac automobile which the petitioner had purchased in 1949 also was seized by the State of North Carolina and sold in 1950 for $2,150 which was applied in partial satisfaction of the tax liability. Various other personal property, including the household furnishings of the petitioner, were also seized by the State of North Carolina in 1950. However, a restraining order was served upon the sheriff preventing him from selling such property and whether or when it was sold is undetermined. At the close of each of the years indicated, the petitioner owed on his note to the Bank of Greensboro the following amounts: Year
Amount
1947
$25,000.00
1948
30,000.00
1949
41,500.00
1950
4,003.05
*110 The respondent in his net worth computation reflected these amounts. The investigating agents were unable to find any liabilities owed by the petitioner at the close of 1945 and 1946. In his net worth computation for each year the respondent included among liabilities a reserve for depreciation on farm equipment based upon a cost of $1,955.15, and to which additions were made at the rate of 10 per cent a year. Such reserve was as follows at the end of each year: Year
Amount
1944
$ 195.52
1945
391.04
1946
586.56
1947
782.08
1948
977.60
1949
1,173.12
1950
1,368.64
In accordance with the conclusions herein, which, in some respects, modify the respondent's determinations, the correct amounts of the petitioner's assets, his liabilities (including depreciation reserve), net worth at the end of each year, and increases in net worth for the taxable years are as follows: [1]
Increase or
(Decrease)
Year
Assets
Liabilities
Net Worth
in Net Worth
1943
$ 57,280.15
$ 57,280.15
1944
95,672.15
$15,195.52
80,476.63
$23,196.48
1945
83,236.79
391.04
82,845.75
2,369.12
1946
90,658.22
586.56
90,071.66
7,225.91
1947
130,258.73
25,782.08
104,476.65
14,404.99
1948
134,793.33
30,977.60
103,815.73
(660.92)
1949
142,718.25
42,673.12
100,045.13
(3,770.60)
1950
148,956.70
5,371.69
143,585.01
43,539.88
*111 In 1950 the petitioner had some of his employees attempt to repossess the yacht which had been seized by the State of North Carolina. The men were arrested and the petitioner paid fines on his and their account totaling $1,000. The respondent in his computation added this amount to the increase in net worth determined by him. The respondent also added the yacht expenses incurred in the years 1948, 1949 and 1950 as set forth hereinabove. The respondent also added to the increase in net worth for 1950 the amount of $2,508.89 representing interest paid by the trustee under the deed of trust on the Sedgefield farm on behalf of the petitioner to the Bank of Greensboro. The respondent also added to the increase in net worth determined by him for each of the years in question an amount of $5,000 representing estimated living expenses. During each of the years indicated the petitioner paid Federal income taxes, including additions *112 to the tax and interest, as follows: Year
Amount
1945
$20,169.65
1947
25,435.35
1949
347.10 The respondent added these amounts to the respective increases in net worth for those years as determined by him. The respondent in each year also added to the increases in net worth the expenditures and contributions claimed as deductions in the returns, and then allowed deductions in those amounts or the standard deduction, whichever was to the benefit of the petitioners. Having eliminated from closing net worth of 1950 the amount of $11,837.50, the cost of the yacht, the respondent added back to income for that year an amount of $3,770.07 as a non-deductible loss on the sale of the yacht. Similarly he added back to income of that year $1,953.87 as a non-deductible loss on the sale of an automobile. The portion of the latter figure which is disallowable and hence to be added to the increase in net worth is $651.29. He allowed as a deduction for 1950 an amount of $130.86 as interest to the Bank of Greensboro. The net income for the taxable years, as reported in the returns, the amount of net income determined by the respondent, the net income reconstructed (by adding *113 to the increases in net worth the amount of estimated living expenses determined by the respondent and other amounts adjusted in accordance with the conclusions herein, and allowing the deductions claimed by the petitioner and allowed by the respondent), and the resulting understatements of net income are as follows: Net Income
Net. Income
Determined
Reconstructed
Under-
Year
Reported
by Respondent
Net Income
statement
1944
$14,444.82
$30,227.42
$27,696.48
$13,251.66
1945
6,098.22
26,999.07
27,038.77
20,940.55
1946
8,034.06
12,048.77
11,725.91
3,691.85
1947
5,366.90
46,044.37
44,340.34
38,973.44
1948
7,580.71
9,046.28
6,348.38
1949
4,144.43
5,292.24
4,306.46
162.03
1950
(17,954.06)
54,320.89
55,221.68
73,175.74
The petitioners executed consents with the respondent extending the time for assessment of the tax for the year 1949 until June 30, 1954, and for the year 1950 until June 30, 1955. The notices of deficiency for all years here in controversy were mailed on April 28, 1954. Some part of the deficiency for each of the years 1944, 1945, 1947 and 1950 was due to fraud with intent to evade tax. The returns *114 for those years were false or fraudulent with intent to evade tax. Opinion Use of Net Worth Method ATKINS, Judge: The petitioners contend that the respondent was not justified in using the net worth method of computing taxable income for the years 1944 to 1950, inclusive, maintaining that the records were adequate and accurate. We have described in the Findings of Fact the type of records which the petitioners kept. The books which might be considered of a permanent nature were mere notebooks containing only monthly summaries of income and expenditures. Obviously the accuracy of such records cannot be checked. Both purchases and sales of liquor were almost entirely by cash. The petitioner in his testimony in effect admits the impossibility of a verification of his purchases. He testified that his books would show more purchases of liquor than could be verified from the records of the wholesalers from whom he purchased, for the reason that such wholesalers would keep no record of selling to him and that they would not even give receipts. Nor would it be possible to verify sales which were for cash and in varying amounts. The petitioner's wife testified that she kept daily records *115 of receipts and disbursements on scratch pads, that she kept such documents as invoices, receipts, etc., and that she kept an inventory of liquor. However, these underlying records were destroyed in 1948 and the records for the period subsequent thereto were apparently lost or destroyed sometime in 1950. In 1948 a revenue agent made an investigation of the petitioner for the years 1944, 1945 and 1946 and made no substantial adjustment in the petitioner's income tax returns for those years. However, later, in 1952, these same years, in connection with later years, were investigated and at that time the only record furnished the revenue agents was the notebook for 1949 containing monthly summaries of purchases, expenses and sales and some records with respect to the construction and operation of the motor court in 1950 and 1951. The petitioner makes much of the fact that in the previous examination for the years 1944, 1945 and 1946 the revenue agent had apparently been satisfied with the records and with the returns as filed, and claims that this places a greater burden in the instant case upon the respondent. We have no detailed evidence as to the extent of this previous investigation. *116 In any event, there is no showing that closing agreements were executed covering those years and we fail to see how such prior investigation would preclude the respondent from later testing the accuracy of the records and the returns by use of the net worth method. The use of the net worth method for this purpose and also as evidence of correct net income is proper even though the petitioner keeps records which on their face appear to be adequate. Morris Lipsitz, 21 T.C. 917, affd. (C.A. 4, 1955), 220 Fed. (2d) 871, certiorari denied 350 U.S. 845; Est. of W. D. Bartlett, 22 T.C. 1228; Estate of George L. Cury, 23 T.C. 305; Harry Gleis, 24 T.C. 941; and Abraham Galant, 26 T.C. - (May 28, 1956). See also Lias v. Commissioner (C.A. 4), - Fed. (2d) - (August 3, 1956), affirming 24 T.C. 280. In the Lipsitz case we stated: "* * * when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, *117 inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * *" We think the respondent was justified, under all the circumstances, in resorting to the net worth method of determining taxable income for the years in question. As stated, the petitioner has raised the question of the extent of the burden of proof. While under section 1112 of the Internal Revenue Code of 1939[2] the burden of proof in respect of fraud is upon the respondent, his determination of deficiencies in tax is presumed to be correct and the burden of proof is upon the petitioner to show error therein. In Leonard B. Willits, 36 B.T.A. 294, it was stated: "Petitioner contends that as respondent has the burden of proving fraud - in order to prevent the tolling of the statute of limitations as to the year 1925, and in order to justify the imposition of the 50 per cent additional tax as to each year - the burden is shifted so as to require him to prove that deficiencies in tax existed. This contention *118 is without merit. While respondent has the burden of proof of fraud, if he is successful in establishing that fact the presumption of correctness of his determination of deficiencies thereupon immediately revives and must be overcome by positive evidence on the part of the petitioner. The statute of limitations does not shift the burden of proof; it merely raises a bar to the assertion by the respondent of any claim for a deficiency in tax; and, once that bar has been removed by proof of fraud, we are where we were before. Cf. L. Schepp Co., supra.25 B.T.A. 419" In Snell Isle, Inc. v. Commissioner (C.A. 5), 90 Fed. (2d) 481, certiorari denied 302 U.S. 734, affirming a decision of this Court, the Court stated: "* * * It is elementary that a ruling of the Commissioner assessing income taxes is presumed to be correct and a taxpayer disputing the assessment has the burden of overcoming this *119 presumption. This was true as to a finding of fraud by the Commissioner, prior to the adoption of the Revenue Act of 1924, § 907, continued in subsequent acts (26 U.S.C.A. § 612) which puts the burden of proving fraud upon the Commissioner. We are not aware of any reported case construing the statute but, considering the presumption, construction is not difficult. "Before the adoption of the statute, in many cases, overcoming of the presumption of fraud was not a hardship. Necessarily, if the taxpayer was able to prove the correctness of his return, the charge of fraud fell. On the other hand, if the taxpayer failed to adequately support his return, and it was erroneous through ignorance in keeping his records or mistake of law or fact, it was extremely difficult to overcome an arbitrary imposition of penalties for fraud. Clearly it was the intention of Congress to relieve the taxpayer of this burden in cases where there was no actual fraud but the act goes no further. The burden still remains on the taxpayer to overcome the presumption arising from the Commissioner's ruling as to the amount of taxes actually due. Neither the letter nor intention of the act *120 will support the conclusion that the entire burden is cast upon the Commissioner when he determines fraud and assesses a penalty." In our Findings of Fact we have reconstructed taxable income by the net worth method. In so doing we have considered each contention specifically made by the petitioners and have made proper adjustments to the extent requested, if justified by the record, as will be more fully discussed hereinafter. The corrected net income and consequent under-statements shown in the Findings of Fact are based almost entirely on proof adduced at the hearing to substantiate the various items used in the reconstruction of taxable income. To a very minor extent those Findings are based upon a presumption in favor of the respondent's determination which has not been overcome by proof adduced by the petitioner. The only item of any consequence not proven is the item of living expenses in the amount of $5,000 which the respondent added to the increase in net worth for each year. As to this item, neither party adduced any proof, and on brief neither party makes any point of it. Opening Net Worth It is fundamental that in the use of the net worth method, it is necessary *121 to determine, with reasonable certainty, an opening net worth to serve as a starting point. Holland v. United States, 348 U.S. 121. The principal contention of the petitioners with regard to the respondent's determination of opening net worth has to do with the amount of cash which the petitioner, Frank Davis, had on hand at January 1, 1944. The respondent determined that he had cash on hand at that time in the amount of $23,128. The petitioner testified that he had cash on hand at that time amounting to $125,000 to $150,000, which was kept in a safe in his home. The petitioner's wife also testified that the petitioner kept cash in the safe, but that she did not have access to the safe. She did not know the particular amount which he kept at any time. She stated that at some time during the winter of 1943-1944 she saw him count a great deal of money which he said amounted to over $100,000. We are unable to accept the testimony as establishing that the petitioner had any such amount of cash on hand. In the investigation for the years 1941, 1942 and 1943 the petitioner told revenue agents that as of August 4, 1944, he had no more than $3,000 to $5,000 in cash on hand. *122 In a petition filed with this Court in Docket No. 7884 relating to the years 1941, 1942 and 1943 the petitioner stated that his entire net worth on December 31, 1943, was $37,025.15. The petitioner has not shown business activities prior to 1944 which would reasonably lead to the conclusion that he could have amassed by January 1, 1944, the amount of cash he claims. He filed no tax returns until 1942. The record shows that in the latter part of 1944 he borrowed $15,000 to buy a farm which cost $32,500. He gives no reason why, if he had as much as $100,000 in cash at January 1, 1944, it was necessary to borrow this $15,000. Despite the fact that the petitioner had no bank accounts and no cash records, the respondent did recognize that the petitioner must have had some cash on hand at January 1, 1944, which he determined to be $23,128. The revenue agent, in connection with the petitioner's case for 1941, 1942 and 1943, calculated cash on hand at December 31, 1943 in the amount of $30,600. The determination as to cash on hand was to some extent an estimate, but it was necessarily so since the petitioner kept no cash records and had no bank accounts. That figure was reduced to $23,128 *123 for settlement purposes. Under the circumstances, we have found it necessary to exercise our judgment in the determination of the cash on hand, and have found as a fact that the petitioner had $30,600 in cash at January 1, 1944. In our reconstruction of the petitioner's taxable income, we have included cash at January 1, 1944, in that amount. The petitioner on brief also asks that we find as a fact that at the beginning of 1944 he had three automobiles which had cost a total of $4,150. The respondent in his determination included only one automobile at a cost of $1,100. The other two automobiles were included by the respondent in closing net worth for the year 1944. The revenue agents in making their investigation found that the petitioner had only one automobile at the beginning of 1944. In their investigation they consulted county tax records and automobile sales slips. The petitioner did not refer to any records and in view of the investigation made by the revenue agents, we are of the opinion that the petitioner was mistaken in his testimony. We have accordingly found as a fact that the petitioner at January 1, 1944, had one automobile with a cost of $1,100. The petitioner *124 further asks that we find that he had on hand at January 1, 1944, livestock which had cost $925. The respondent included livertock at a figure of $500. The agents testified that at the time of the investigation the petitioner told them that he had mules which had cost him about $500. At the hearing the petitioner testified that in addition thereto he had horses and cows which had cost him $425. We have accordingly found as a fact that at January 1, 1944, the petitioner had livestock which cost $925 and have used that figure in our reconstruction of taxable income. The petitioner requests that we find that he had farm machinery at January 1, 1944, costing $2,500. However, the stipulation of facts shows that at the end of each of the years 1943 to 1950, inclusive, the petitioner had farm machinery which had cost $1,955.15, which was the amount determined by the respondent. The petitioner also requests that we find that at January 1, 1944, he had furnishings in his Randleman Road farmhouse which had cost $13,500. The respondent included no amount representing furniture. We cannot doubt that the petitioner had some investment in furniture. However, he did not testify in detail regarding *125 the furniture or submit or refer to records or state definitely how much he did have invested in furniture. At the hearing he testified, "Furniture, I guess I had around between $13,000 and $14,000 in furniture." His county personal property tax return as of January 1, 1945, shows household furnishings of a total "true cash value"of $2,150. We have no evidence as to what these household goods cost. Using our best judgment, we have found as a fact that he had household furnishings at January 1, 1944, which had cost $6,500. We have used that figure in opening and closing net worth in our reconstruction for each year under consideration. Increase in Net Worth Cash The petitioner attacks the respondent's determination ff cash in the amount of $20,000 on hand at the end of 1944, on the ground that it is a pure estimate. The respondent in fixing that figure took into consideration that early in 1945 the petitioner paid about $20,000 in Federal income taxes, additions to the tax and interest, and that the petitioner required some cash to operate his liquor business. Since the petitioner kept no record of cash on hand and had no bank accounts, the determination of cash on hand at any *126 given time must necessarily be to some extent an estimate. It has been shown that the petitioner, in connection with the investigation of his income tax liability for 1941, 1942 and 1943, told the revenue agents that at August 4, 1944, he had no more than $3,000 to $5,000 in cash. He further stated that he generally kept on hand only enough money to run his business. At the hearing the petitioner testified that the minimum amount required by him to carry on his liquor business was $25,000. The petitioner does not attempt to show specifically how much cash he had on hand at the end of any of the years in question except to state that all of the money which he used to purchase the motor court in 1950 and 1951 had been earned over many years and prior to the year 1944. As previously stated herein, we are unable to accept his testimony as the basis for a finding that the amount of cash used to buy the motor court in 1950 and 1951 was on hand at the beginning of 1944. Based upon the record and using our best judgment, we have found as a fact that at December 31, 1944, the petitioner had cash on hand in the amount of $25,000. It is also claimed that the respondent's determination of cash *127 on hand at the end of each of the years 1945 to 1950 was erroneous. The respondent determined that the petitioner had on hand at December 31, 1950, cash in the amount of $79,118.57. In our Findings we have described the manner in which this figure was calculated. We think the respondent's calculation of this amount was reasonable. His starting point was the cost of the motor court which was completed in 1951 at a cost of $142,425.31, of which $111,854.98 was paid by the petitioner out of his accumulated cash. One figure used by the respondent, namely, $35,236.41, as being the amount spent for this purpose in 1950 has been corrected by stipulation to a figure of $33,123.18. Substituting the proper figure in the calculation results in a figure of $81,231.80 of cash on hand at December 31, 1950. The evidence shows that the petitioner devoted most of his time in the first half of 1951 to the construction of the motor court and that the liquor partnership with his half-brother terminated in February 1951. It has been stipulated that he and his wife had income in 1951 of $12,876.84, but most of that was earned in the latter part of 1951. Accordingly, it seems clear that none of the cash *128 paid for the motor court came out of current earnings of 1951. Upon the basis of the whole record, we are satisfied, and have found as a fact, that the petitioner had on hand at December 31, 1950, cash in the amount of $81,231.80. Tending to corroborate this is the petitioner's statement to the revenue agents that when he came to Myrtle Beach in August 1950, he had from $100,000 to $105,000 in cash. The respondent determined the cash on hand at the end of 1945, 1946, 1947, 1948 and 1949 by deducting from the amount of cash on hand at December 31, 1950, the amount of $20,000 which he determined was the cash on hand at December 31, 1944, and allocating the difference over the intervening period on the basis of gross sales of liquor as shown in the returns. The petitioners contend that this method of allocation is arbitrary and that a more equitable method of allocation would be on the basis of net profits for the various years as shown in the returns. We fail to see how that method would be more accurate than the method used by the respondent. Neither party has suggested that it would be more equitable to allocate the cash evenly over the years. Cf. United States v. Ridley (D.C. Ga.) 120 Fed. Supp. 530. *129 We know of no better or more equitable way to allocate the cash over the years it was accumulated than in the manner employed by the respondent. We have accordingly substituted the amount of $25,000 instead of $20,000 as cash on hand at the beginning of 1945 and have found cash on hand at the end of each of the years 1945 to 1949 calculated upon this method of allocation. These amounts of cash are reflected in our net worth reconstruction. State Tax Liability It is contended that the respondent erred in his net worth computation in failing to include as a liability the amount of $47,074.29 representing the amount assessed in 1949 for state retail liquor taxes, penalties and interest for the years 1945, 1946 and 1947. The respondent's position is that to include such liability in closing net worth for 1949 would in effect amount to the allowance of a deduction for such liability, whereas since the petitioner had not paid the liability and since he operated on a cash basis, it would be improper to allow him such a deduction. We agree with the respondent. To include such amount as a liability in computing closing net worth for 1949 would distort the computation of the increase in *130 net worth for that year, thereby offsetting taxable income and in effect permitting a deduction for taxes which had not been paid by the petitioner in that year. In 1950 the State of North Carolina seized and sold the petitioner's yacht for $8,067.43 and applied this amount in partial satisfaction of the petitioner's liability to the state. The respondent has in effect allowed the deduction for the taxes so paid by excluding the yacht from closing net worth of 1950. The yacht had a cost basis in the hands of the petitioner of $11,837.50 and was included by the respondent in opening net worth for 1950 in that amount. The respondent treated this disposition of the yacht as resulting in a nondeductible loss to the petitioner of $3,770.07, being the difference between the basis and the amount for which it was sold by the state and applied on the tax liability. He, therefore, in his computation added such loss to the increase in net worth for that year and hence to taxable income. The respondent thus treated the yeacht as a personal rather than as a business asset. At the hearing the petitioner testified as follows: "Q. Now, Mr. Davis, there was testimony about your ownership of a boat *131 in 1948. Would you tell us about that boat? "A. Yes, sir. My brother and myself bought that boat at the Atlantic Yacht Corporation in Norfolk, Virginia. We bought that boat for pleasure and entertainment of customers and associates. "Q. Was it used in any way in connection with liquor deliveries? "A. No, sir, never was used - no liquor delivered. "Q. What business use was made of the boat, if any? "A. Well, I don't know whether you call it business use or what, but there were several buyers that I would service, sold to, I would invite them down. They wanted to go fishing. I would invite them down and take them out fishing for a couple days at a time. "Q. What percentage of the use of the boat was devoted to that purpose, Mr. Davis? "A. Well, I would not say over half at the most." However, the petitioner did not elaborate upon this nor did he attempt to show that this entertainment of his customers would reasonably tend to increase his business. In fact, a revenue agent and a special agent each testified that in discussing the yacht with the petitioner he had told them that it was strictly a personal yacht. The evidence further shows that the petitioner did not, in *132 his returns for the years during which he owned the yacht, claim any deductions on account of operating expenses of the yacht or depreciation thereon. We accordingly approve the respondent's computation insofar as his treatment of the sale of the yacht is concerned. The State of North Carolina also seized the petitioner's Cadillac automobile and sold it in 1950 for $2,150 which was applied upon the petitioner's tax liability to the state. Here again the respondent has in effect allowed the deduction of the amount of $2,150 as taxes paid by eliminating the cost of the automobile from the closing net worth of 1950. This automobile had a cost basis in the petitioner's hands of $4,103.87 and the respondent treated the difference between that basis and the $2,150, namely, $1,953.87 as a nondeductible loss and added it to the increase in net worth for the year 1950. In this latter respect we think the respondent erred. The evidence shows, and we have found as a fact, that two-thirds of the use of this automobile was for business purposes and we are of the opinion that the amount properly to be added to the increase in net worth is only one-third of the loss of $1,953.87, namely, $651.29. *133 The State of North Carolina also seized in 1950 the petitioner's household furnishings above referred to which had cost $6,500. However, there is no showing that these assets were sold by the state in 1950 and we see no reason for eliminating this figure from the closing net worth of 1950. The petitioner, so far as we know, could at any time have redeemed these assets. Apparently they were not applied in 1950 by the state in satisfaction of any state tax liability and hence there would be no reason to allow a deduction for taxes paid on account of the seizure. Even if the seizure were considered as resulting in any loss of these assets to the petitioner in 1950, such loss would have been a loss of personal rather than business assets and would not be deductible. Yacht Expenses The evidence discloses that the petitioner expended specified amounts, as set forth in our Findings of Fact, during the years 1948 to 1950, inclusive, in connection with his yacht. The respondent has added these amounts to the increases in net worth computed by him to arrive at taxable income for those years. The petitioner contends that one-half of these expenditures was reimbursed to him by his brother, *134 Ervin, and inferentially requests that only one-half of those expenditures be so added in the computation. The petitioner testified that his brother, Ervin, did reimburse him for expenditures incurred during the time that Ervin was a co-owner of the yeacht with him. We do not know when Ervin sold his one-half interest to the petitioner, except that it was some time in 1949. Under the circumstances, we are not in a position to determine what portion of the expenditures for 1949, if any, was reimbursed to the petitioner by Ervin and certainly no part of the expenditures for 1950 was reimbursed. On the other hand, we are of the opinion that in computing the taxable income for the year 1948, only one-half of the amount of $4,018.60 should be added to the increase in net worth and this has been reflected in our reconstruction of the taxable income for 1950. Miscellaneous In his original computation the respondent included among expenditures for 1950 taxes paid and interest thereon in the amounts of $289.01 and $58.09, respectively. These amounts were paid in 1949 and adjustment has been made accordingly in the reconstruction. Also, in his original computation the respondent included *135 among expenditures in 1949 an amount of $1,000 for fines paid. This amount was actually paid in 1950 and adjustment has been made accordingly in the reconstruction. Fraud Issue For each of the years in question the respondent added to the deficiencies determined by him, 50 per cent thereof pursuant to section 293(b) of the Internal Revenue Code of 1939[3] on the ground that some part of each deficiency was due to fraud with intent to evade tax. As has been previously pointed out herein, section 1112 of the Internal Revenue Code of 1939 imposes the burden of proof upon the respondent in respect of the issue of fraud. And it has been held that fraud must be established by clear and convincing evidence. Frank Imburgia, 22 T.C. 1002, and Arlette Coat Co., 14 T.C. 751. However, in determining *136 whether the respondent has established fraud we may consider the entire record and are not limited to the respondent's affirmative evidence on the fraud issue. Frank Imburgia, supra, Wallace H. Pettit [Petit], 10 T.C. 1253, L. Schepp Co., 25 B.T.A. 419. In M. Rea Gano, 19 B.T.A. 518 [Dec. 5962], we stated: "To establish fraud by direct proof of intention is seldom possible. Usually it must be gleaned from the several transactions in question and the conduct of the taxpayer relative thereto." In Holland v. United States, supra, the Supreme Court stated in part: "A final element necessary for conviction is willfulness. The petitioners contend that willfulness "involves a specific intent which must be proven by independent evidence and which cannot be inferred from the mere understatement of income." This is a fair statement of the rule. Here, however, there was evidence of a consistent pattern of underreporting large amounts of income, and of the failure on petitioners' part to include all of their income in their books and records. Since, on proper submission, the jury could have found that these acts supported *137 an inference of willfulness, their verdict must stand. Spies v. United States, supra, 317 U.S. at pages 499-500, 63 S. Ct. 368." In Arlette Coat Co., supra, we stated in part: "Where over a course of years an intelligent taxpayer and business man has received income in substantial amounts, as shown by this record, and has failed to report that income, and where no books or records were kept by him and no tenable explanation was offered for the failure to report the income received, the burden of the respondent in our judgment, is fully met. We think this conclusion is amply supported by authority. As stated by the Circuit Court of Appeals for the Sixth Circuit in Rogers v. Commissioner, 111 Fed. (2d) 987, affirming 38 B.T.A. 16 [38 BTA 16]: '* * * Discrepancies of 100% and more between the real net income and the reported income for three successive years strongly evidence an intent to defraud the Government. The Board did not err in deciding that 50% penalties should be assessed.'" Here the petitioner's illicit liquor business was conducted almost entirely by cash transactions and he did not keep adequate records. Despite *138 the fact that lack of records for 1941, 1942 and 1943 resulted in computations of taxable income upon the net worth basis and the petitioner was therefore aware of the necessity of keeping proper records, he still persisted in failing to keep adequate records. As set forth in our Findings of Fact, our reconstruction of net income for the years in question discloses that the petitioner in his returns understated net income for each of the years 1944, 1945, 1947 and 1950 in substantial amounts. The total of the corrected net income for those years is $154,297.27, whereas the reported total net income for those years was only $25,909.94. The respondent has established by affirmative evidence all items, except minor ones, used in the reconstruction of taxable income for those years. The omission of such large sums is sufficient to sustain the respondent's burden of proof and is convincing that some part of the deficiencies for those years was due to fraud with intent to evade tax. See Holland v. United States, supra, Arlette Coat Co., supra.We have found as a fact that some part of the deficiencies for those years was due to fraud with intent to evade tax and *139 the additions to the tax for fraud are sustained. Our reconstruction of taxable income for the year 1948 shows that there was no understatement of taxable income by the petitioners in their return. Our reconstruction shows that there were understatements for the years 1946 and 1949 in the respective amounts of $3,691.85 and $162.03. As has been stated, our reconstruction of net income rests to a limited degree upon the presumption in favor of the respondent's determination. Considering the relatively small understatements shown by our reconstruction and the respondent's failure to affirmatively establish the omission by the petitioners of any substantial amounts of income from the returns for those years, we cannot hold that the respondent has shown by clear and convincing evidence that any part of the deficiencies for those years was due to fraud with intent to evade tax. We accordingly disapprove his action in determining additions to the tax for those years. Statute of Limitations The parties are in agreement that, due to the filing of consents by the petitioner, the assessment of any deficiencies for the years 1949 and 1950 is not barred by the statute of limitations. However, *140 for the years 1944 to 1948, inclusive, assessment of deficiencies is barred by the statute of limitations unless the returns for those years were false or fraudulent with intent to evade tax. Section 276 of the Internal Revenue Code of 1939. [4]
For the reasons set forth above, we are of the opinion that the respondent has shown that the returns for the years 1944, 1945 and 1947 were false or fraudulent with intent to evade tax and have so found as a fact. Accordingly, assessment of any deficiencies and additions thereto for those years is not barred by the statute of limitations. Also for reasons set forth above, we are of the opinion that the respondent has not shown that the return for the year 1946 was false or fraudulent with intent to evade tax, and consequently assessment of any deficiency or addition to the tax for that year is barred by the statute of limitations. Decisions will be entered under *141 Rule 50. Footnotes
1. For the years 1948, 1949 and 1950 joint returns were filed and the figures for those years represent the combined assets of both petitioners. The only item shown to belong to the petitioner, Arline Davis, consisted of lots which had cost $1,800.↩
2. SEC. 1112. BURDEN OF PROOF IN FRAUD CASES. In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner.↩
3. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
4. SEC. 276↩. (a) False Return or No Return. In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.